UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Cause No. 1:22-CR-40-HAB |
| ) | |
| GERARDO NINO ROMERO ) | |
| ) | |

**OPINION AND ORDER**

For his part in a drug trafficking conspiracy, Defendant, Gerardo Nino Romero, is charged in two counts of a six count Indictment. Count 1 charges the Defendant, along with his cohorts Ramiro Nunez Diaz and Gustavo Adolfo Calderon Martinez, with conspiracy to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Count 6 charges the Defendant with possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1). Defendant was charged in Count 6 after a search of his residence on Valdosta Drive yielded evidence of drug trafficking activity. Defendant now challenges the probable cause for issuance of the search warrant for his property and the veracity of the averments in the search warrant affidavit. (ECF No. 54). He requests an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (ECF No. 55). The motions are fully briefed (ECF Nos. 54, 55, 63, 65, 67), and ripe for consideration. Because the Court finds no basis for a *Franks* hearing and that the warrants were properly issued and supported by probable cause, both motions will be denied.

**SEARCH WARRANT AFFIDAVIT**

On May 20, 2022, Magistrate Judge Paul R. Cherry authorized federal search warrants for two target locations (TL). TL 1 is a residence located on Holton Avenue in Fort Wayne, Indiana. TL 2 is a residence located on Valdosta Drive in Fort Wayne, Indiana. The search warrants were supported by a lengthy affidavit of FBI Task Force Officer, Michael Long (TFO Long) – a veteran

law enforcement officer of 17 years. Since 2011 TFO Long has worked with the Fort Wayne Police Department (FWPD) Vice and Narcotics Division in drug investigations. (Application for Search Warrant, ECF No. 63-1).

To say that this drug trafficking investigation was long and complex would not give sufficient credit to the law enforcement involved. The Application for Search Warrant is 61 pages and contains a thorough, methodical recitation of the nearly 18 months of events leading to the requests to search the TLs for evidence of drug trafficking activity. The present motions solely question the probable cause for the warrant issued for TL 2. For this reason, the Court will recite many facts in summary fashion, as did the parties in their respective briefs.

1. **The Initial Investigation and Reliability of the CHS**

In November 2021, a confidential human source (CHS) provided information to law enforcement about members of a drug trafficking organization (DTO)[1] distributing narcotics in the Fort Wayne area. The CHS was not a paid informant and was not expecting any benefit in exchange for the information provided. The CHS had prior misdemeanor arrests involving alcohol, marijuana possession, and domestic battery, all referenced in the Affidavit.

The CHS informed law enforcement that Gustavo Adolfo Calderon Martinez (Calderon Martinez) offered to sell the CHS cocaine in kilogram quantities in mid-October 2021. The CHS also explained that Calderon Martinez had been selling cocaine for $32,000 to $37,000 per kilogram, depending on if the cocaine is cut. The CHS explained that the drugs were delivered to Aurora, Illinois to an individual named Margaro Dominguez (Dominguez). The drugs were then

---

[1] Law enforcement believed the DTO was affiliated with the Jalisco New Generation Cartel ("the Cartel") and were trafficking large amounts of cocaine, marijuana, and methamphetamine from Mexico to Fort Wayne, Indiana. (ECF No. 63-1 at 10). The Cartel is abbreviated with the acronym CJNG in the Affidavit to reflect the Spanish abbreviation of the Cartel's name.

2

transported to Fort Wayne for distribution by Calderon Martinez and Defendant Nino Romero (Nino Romero).

The CHS knew Calderon Martinez to drive either a blue Volkswagen Jetta or a dark gray SUV, later identified as a Dodge Journey. The CHS did not know Nino Romero's current residence but knew that he lived with his mother near the intersection of Lafayette and Pontiac streets in the Fort Wayne area. The CHS disclosed that Nino Romero is in the real estate business and drives a white Chevy Silverado pickup truck. The CHS told law enforcement that Nino Romero distributes drugs for Calderon Martinez, assists him with laundering money and cuts the drugs. The CHS advised that Nino Romero and Calderon Martinez were having work done on a real estate property located on Ashbrook Drive. The CHS had no history of obtaining drugs from this DTO but was familiar with the organization from having lived in the same area in Mexico as the various participants. The CHS also overheard a conversation in Mexico relating to the DTO.

Information received from the CHS was corroborated through a series of investigative steps and controlled buys which continued throughout the investigation. For instance, surveillance confirmed that Calderon Martinez commonly drives a blue Volkswagen Jetta and a Dodge Journey. Information obtained from motor vehicle records revealed Dominguez had an Illinois driver's license with an address in Aurora, Illinois. Records also confirmed that Calderon Martinez has an Illinois license with the same Aurora, Illinois address as Dominguez. From property records, law enforcement located an address on Holton Avenue, Fort Wayne, Indiana, that was confirmed by property records to be under a buyer contact to "Alvarez Mariana Hernandez and Martinez Gustavo Adolfo Calderon." Agents believed this Holton Avenue address to be the primary residence of Calderon Martinez. This address is TL 1 throughout the Application for Search Warrant.

On November 18, 2021, investigators conducted surveillance on the Ashbrook Drive residence, anticipating identifying Calderon Martinez through a traffic stop. A traffic stop did, in fact, occur with Calderon Martinez in the subject vehicle, a BMW, driven by Ramiro Nunez Diaz (Nunez Diaz). During the stop, Calderon Martinez provided the address of TL 1 as his residence, confirming information agents had received.

Besides providing information, the CHS performed a series of controlled buys followed by subsequent controlled payments from Calderon Martinez and Nunez Diaz. Controlled buys were conducted on January 10, 2022, April 6, 2022, April 20, 2022, and May 5, 2022, with controlled payments made on April 12 and April 21, 2022. Based on the initial controlled buys, investigators obtained two tracking warrants, one for Nunez Diaz's BMW and the other for Calderon Martinez's blue Volkswagen Jetta. (*See* 1:22-MJ-69). Before the May 5, 2022, controlled buy, investigators obtained a tracking warrant for the Dodge Journey associated with Calderon Martinez. (*See* 1:22-MJ-75).

Law enforcement reaffirmed during their investigation that the CHS had some level of access to the DTO and the Cartel. Calderon Martinez's uncle, Antonio Calderon Martinez (Antonio), is a Cartel member and contacted the CHS directly[2] to offer him kilogram quantities of drugs through his nephew. (ECF No 63-1 at 22). This communication was recorded and during that conversation Antonio offered "all of the kilos they wanted" and it "would just be a matter of money and who was going to receive the drugs." (*Id.*). Antonio instructed that the CHS should go through Calderon Martinez to get the drugs.

Given the ongoing nature of the investigation and the continuing verification of information obtained from the CHS, law enforcement believed the CHS to be a credible informant.

---

[2] The CHS's relative spoke to Antonio in the presence of the CHS.

4

## 2. The Controlled Buys and Controlled Payments Connecting TL 2

As reflected above, the FBI conducted multiple controlled drug purchases over time, using the same procedures for all the buys. Agents searched the CHS's person and vehicle, finding no contraband. The CHS was equipped with an audio and video recorder and the agents maintained constant surveillance to and from the meeting locations. When possible, physical surveillance occurred during the transactions or agents listened to the transactions live. Agents recorded and documented pre-buy communications and reviewed text messages and WhatsApp messages used to coordinate the deals. After the transactions, agents conducted post-buy searches of the CHS and vehicle, finding no contraband. The CHS provided agents with the drugs bought and agents field tested the drugs. Agents then reviewed the recordings, confirming the CHS's information about the transactions.

Details of each of the transactions are provided in the Affidavit but need not be fully recounted below. Buys were conducted on different occasions from Nunez Diaz and Calderon Martinez. Relevant to the present motions are the transactions involving Calderon Martinez because these transactions provide the details relied on by law enforcement to seek a warrant to search TL 2.

On April 6, 2022, the CHS bought three ounces of cocaine from Calderon Martinez. Surveillance observed Calderon Martinez as he left TL 1 in his Volkswagen Jetta and drove to the transaction location on Robinwood Drive. The CHS entered the Jetta and Task Force Officer Adalberto Martinez (TFO Martinez), who is fluent in English and Spanish, monitored the deal through a listening device. Field testing confirmed the substance to be cocaine weighing 94.1 grams (with packaging). Payment from the CHS to Calderon Martinez was accomplished through

a separate monitored transaction on April 12, 2022. During this payment meeting, Calderon Martinez discussed the potential for heroin purchases, availability, and pricing.

On April 20, 2022, the CHS visited with Calderon Martinez at an unspecified location. During the visit, Calderon Martinez offered the CHS five ounces of heroin. Calderon Martinez explained that he would have the heroin later that evening because he had to pick it up from a different location. Later, surveillance observed Calderon Martinez leave TL 1 with a woman and three children in a Dodge Journey. Surveillance followed the Dodge Journey to TL 2. A minute later, Nino Romero exited the house and met with Calderon Martinez in the driveway near the Dodge Journey. The two entered TL 2 through a garage entry door and, after approximately 25 minutes, Calderon Martinez exited the garage entry door, carrying a white, five-gallon bucket that appeared heavy. Calderon Martinez put the bucket in the rear cargo area of the Dodge Journey and proceeded, with his family still with him, to meet the CHS near Robinwood Drive to complete the controlled buy. The CHS provided the bucket delivered by Calderon Martinez to the CHS to the agents. Five bags of heroin were located inside a Tupperware container in the bucket. TFO Long stated from his training and experience that drug traffickers will often use other individuals to make them look less suspicious. He also stated that drug traffickers often hide drugs for sale and proceeds from drug transactions in separate stash houses.

On May 5, 2022, the CHS coordinated another controlled buy of heroin from Calderon Martinez, stating that he needed "four buckets of brown paint" in the communications. Calderon Martinez texted the CHS stating that "the guy with the heroin" was unavailable until after 8:00 p.m. At 8:09 p.m. surveillance observed the Dodge Journey driven by Calderon Martinez, this time with a woman and a juvenile inside, arrive at TL 2. Around the same time, a white work van marked with GNC Remodeling was in the driveway. Nino Romero is the registered agent for this

company. At around 9:01 p.m., Calderon Martinez left TL 2 in the Journey and headed to the meeting location near Robinwood Drive. Calderon Martinez got into the CHS vehicle and provided the heroin to the CHS in a Lay's potato chip bag hidden under potato chips. During this exchange, Calderon Martinez commented that he got the heroin from his friend's house out north and he pays this friend to watch the kilos for him.

Based on the above facts, Magistrate Judge Cherry issued search warrants for both TLs. The Fort Wayne Safe Streets Gang Task Force served the search warrant for TL 2 on May 24, 2022. That search yielded a host of evidence indicative of drug trafficking activity.

## DISCUSSION

Defendant challenges the probable cause for the issuance of the search warrant for TL 2, as well as the reliability, veracity, and basis of knowledge of the averments in the affidavit. The Government opposes the motion asserting that the Magistrate Judge properly concluded that probable cause existed to believe evidence of drug trafficking activity would be found in both TLs and Defendant has failed to make a substantial preliminary showing of material falsity or omissions to warrant a *Franks* hearing. The Court turns first to the Defendant's *Franks* argument as the Court can make short shrift of that request.

Search warrant affidavits are presumed to be valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). That said, a search warrant is invalid if police officers obtain it by deliberately or recklessly providing the issuing court with false, material information. *United States v. McMurtrey*, 704 F.3d 502, 504 (7th Cir. 2013). In *Franks*, the Supreme Court defined the procedure, evidentiary burdens, and proper remedies associated with a defendant's attack on the truthfulness of statements made in an affidavit supporting the issuance of a search warrant. To obtain a *Franks* hearing, the defendant must make a "substantial preliminary showing" of (1) a material falsity or omission that

would alter the probable cause determination, and (2) a deliberate or reckless disregard for the truth. *McMurtrey*, 704 F.3d at 508. "These elements are hard to prove, and thus *Franks* hearings are rarely held" because a defendant seeking a *Franks* hearing "bears a substantial burden to demonstrate probable falsity." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (citations omitted). "Conclusory, self-serving statements are not enough to obtain a *Franks* hearing." *United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) (citing *Franks*, 438 U.S. at 171). Allegations of falsehood or reckless disregard for the truth must be "accompanied by an offer of proof." *Franks*, 438 U.S. at 171.

As the Government is quick to point out, the Defendant's *Franks* request is not that at all; it is simply a different way of repeating his argument that probable cause was lacking to search TL 2. A defendant seeking a *Franks* hearing bears a substantial burden and, here, that high standard necessary under *Franks* to warrant a hearing has not even been attempted. The Defendant has not put forth an offer of proof or *any* proof. In fact, the Court cannot discern from his filing what the basis for a *Franks* hearing would be. The Defendant has provided no information about what he believes TFO Long misstated or misrepresented nor does he assert that he omitted material information that would have made a difference to the probable cause analysis. What's more, he has presented no evidence, either direct or circumstantial, of the affiant's state of mind about the allegedly omitted information. *See United States v. Daniels,* 906 F.3d 673 (7th Cir. 2018) ("To secure a *Franks* hearing, a defendant must put forth 'an offer of proof' that is 'more than conclusory' and gestures toward more than negligent mistakes."); *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014) (requiring "direct evidence of the affiant's state of mind" or else "circumstantial evidence of a subjective intent to deceive"). Thus, on this basis alone, the Court cannot authorize a *Franks* hearing and that motion is DENIED,

Having found that no *Franks* hearing is warranted, the only remaining question is whether the totality of the circumstances supported the Magistrate Judge's probable cause determination for TL 2. This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it is here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco,* 576 F.3d 745, 748 (7th Cir. 2009). A search warrant affidavit establishes probable cause when, based on the totality of circumstances, it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk,* 402 F.3d 773, 776 (7th Cir. 2005) (citing *United States v. Peck,* 317 F.3d 754, 755–56 (7th Cir. 2003), and *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sims,* 551 F.3d 640, 644 (7th Cir. 2008) (ellipsis and brackets omitted).

When the facts submitted in the affidavit stem from a confidential informant, the legitimacy of a probable cause determination turns on the informant's reliability, veracity, and basis of knowledge. *United States v. Olson,* 408 F.3d 366, 370 (7th Cir. 2005). To assess credibility, the Court considers whether the informant: (1) had firsthand knowledge; (2) provided sufficient details; (3) relayed information which was subsequently corroborated; and (4) testified at a probable cause hearing. *Id.*

Here, the CHS did not testify at a probable cause hearing, but the remaining factors more than support the Magistrate Judge's conclusions relating to probable cause and the issuance of the

9

warrant for TL 2. *See United States v. Brack*, 188 F.3d 748, 756 (7th Cir. 1999) ("[A] deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability."). There is no question that the Government has made a strong showing demonstrating the reliability of CHS's information. Not only was the information received from the CHS confirmed by property and motor vehicle records, there was physical surveillance, recorded surveillance, audio surveillance, tracking information, and perhaps most importantly, controlled buys. Each of the controlled buys and the procedures used by law enforcement also provided independent and contemporaneous corroboration of the CHS's reliability. *See United States v. Orr*, 969 F.3d 732, 737 (7th Cir. 2020) ("Generally, a controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity.") (quoting *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006)); *United States v. McKinney*, 143 F.3d 325 (7th Cir. 1998) ("[C]ontrolled buys add great weight to an informant's tip.").

Defendant, however, asserts that even if some of the facts were reliable, there was no confirmation by law enforcement that the Defendant was linked to the other participants or that the CHS had ever met the Defendant. He also asserts that there is no evidence that the Defendant sold drugs from TL 2 or sold drugs at all. "But probable cause for a search warrant need not be tied to any particular person." *United States v. Gibson,* 2021 WL 1705596, at *5 (7th Cir. Apr. 30, 2021) (citing *Gates*, 462 U.S. at 238 (requiring "a fair probability that contraband or evidence of a crime will be found *in a particular place*")). As the Government points out, even if Defendant had no connection to any of the participants, the facts support a fair probability that contraband would be found at TL 2. Indeed, TFO Long's affidavit (and the inferences the Magistrate Judge

10

may draw from the affidavit)[3] tied the Defendant's residence[4] to two controlled buys, most likely as a stash house. Before both the April 20 and May 5 transactions, Calderon Martinez stopped at TL 2 before meeting with the CHS to provide him with heroin. On April 20, Calderon Martinez removed a white five-gallon bucket loaded with heroin from TL 2 and delivered it to the CHS. Based on this evidence alone, the Magistrate Judge had sufficient information to "[m]ake a practical common-sense decision" that there was a fair probability that contraband or evidence of a crime will be found at TL 2.

But there was even more for the Magistrate Judge to consider; there was the May 5 controlled buy and the statements from Calderon Martinez that his friend "up north" secreted the drugs for him. And … there's even *more* … TFO Long detailed the exact timing of the May 5 pick up of the drugs by Calderon Martinez from "the guy with the heroin." Calderon Martinez told the CHS that "the heroin guy" was unavailable until 8:00 p.m. Surveillance then followed Calderon Martinez to TL 2, with his vehicle arriving at 8:13 p.m. Calderon Martinez stays at TL 2 for a short time and then advises the CHS he is on his way to complete the transaction. These facts taken together leave little doubt that the Magistrate Judge properly found probable cause to believe that TL 2 may be a stash house and evidence of drug trafficking activities could be found there. [5]

---

[3] "[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018).

[4] Throughout his briefs, Defendant makes statements such as the search warrant "authorized the search of a home *alleged to be the residence* of Gerardo Nino Romero." Although the parties do not address the question of standing, if the Defendant is implying that he did not reside at TL 2, he would be foreclosed from challenging the search of that property. *Minnesota v. Carter,* 525 U.S. 83, 101 (1998) (to claim Fourth Amendment protection, a defendant must show that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable).

[5] The Defendant also argues that the information for TL 2 was stale by the time the warrant was sought. This is a baffling argument for two reasons. First, the last two controlled transactions which form the crux of the probable cause analysis occurred within weeks of the warrant request, with the last one occurring two weeks before the warrant was sought. Second, information does not become stale when police are

11

The Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review." *Gates,* 462 U.S. at 236. Thus, a Magistrate Judge's finding of probable cause "carries a strong presumption of correctness." *United States v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018). That finding was correct here.[6]

## CONCLUSION

Defendant's Motion for *Franks* Hearing (ECF No. 55) and his Motion to Suppress (ECF No. 54) are DENIED. The Court will set this matter for trial by separate entry.

SO ORDERED on December 29, 2022.

                                          s/ *Holly A. Brady*
                                          JUDGE HOLLY A. BRADY
                                          UNITED STATES DISTRICT COURT

---

involved in an ongoing investigation. Indeed, the Seventh Circuit holds that "passage of time is less critical when the affidavit refers to facts that indicate ongoing criminal activity." *United States v. Harris*, 464 F.3d 733, 739 (7th Cir. 2006) (quoting *United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999). As is clearly evident from the affidavit, this was not a one-off drug buy by a confidential informant from a low-level dealer where a delay in seeking a warrant might give rise to a staleness argument. This was a complex investigation of a drug enterprise spanning 18 months and involved large quantities of narcotics and repetitive trafficking activities.

[6] Because the Court finds probable cause existed for issuance of the warrants, the Court need not address the alternative argument offered by the Government that the officers' good-faith reliance on the warrant validates the search.